**UNITED STATES of America**

**v.**

**Willie ROBINSON, Jr., Appellant.**

**No. 23734.**

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc Feb. 26, 1971.

Decided June 30, 1971.

Mr. Joseph V. Gartlan, Jr., Washington, D. C. (appointed by this court) with whom Mr. John K. Crummey, Washington, D. C., was on the brief, for appellant.

Mr. Henry F. Greene, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and John F. Evans, Asst. U. S. Attys., were on the brief, for appellee. Mr. Earl J. Silbert, Asst. U. S. Atty., also entered an appearance for appellee.

Mr. Scott R. Schoenfeld Washington, D. C., filed a brief on behalf of Americans for Effective Law Enforcement, Inc., as amicus curiae.

## ON REHEARING EN BANC

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting *en banc*.

McGOWAN, Circuit Judge:

This appeal from a jury conviction for federal narcotics offenses (26 U.S.C. § 4704(a) and 21 U.S.C. § 174) raises questions under the Fourth Amendment, as difficult as they are important, of the permissible scope of the search of the person incident to a lawful arrest. Heard and decided initially by a division of this court on a ground not raised in the trial court, the case was reheard *en banc*. Hampered by the fact that the taking of evidence in the District Court was not focused upon the scope issue first raised here, we have concluded that the resolution of that issue must abide a remand in which that can be done. We address ourselves initially, however, to two questions, raised in both the District Court and here, which were pretermitted by the division. Finding against appellant on the merits of both, the remand we make is in order.

### I

A pretrial motion to suppress evidence, in the form of narcotics taken from the possession of appellant at the time of his arrest, was the subject of an evidentiary hearing out of the presence of the jury. In that hearing Officer Jenks of the Metropolitan Police Department testified that at 12:45 A.M. on April 19, 1968, he stopped a 1965 Cadillac at 9th and U Streets, N. W., for what he described as a "routine spot check." Appellant, the driver of the Cadillac, was asked to exhibit his driver's permit and the vehicle registration. Appellant, according to Jenks, handed over a temporary driver's permit, the registration, and a selective service classification card. Officer Jenks made notes of the first and third of these items, remarking in the process a dis-

crepancy in the birth dates on each, that on the driver's permit being 1938 and, on the draft card, 1927. Appellant was then permitted to go on his way. Officer Jenks later checked traffic records and discovered that appellant's driver's license had been revoked, and that the temporary permit had been issued in response to an application which represented the date of birth to be 1938.

Four days later, on April 23, Officer Jenks again encountered appellant, operating the same Cadillac. Officer Jenks stopped him with, as he put it, "the intention of arresting [appellant] for operating after revocation and obtaining a permit by misrepresentation." When appellant produced the same temporary permit as before, he was told that "he was under arrest for operating after revocation." Officer Jenks then testified:

> "I advised him of his rights, and searched him immediately in front of me. I noticed in his left coat pocket—breast pocket of his coat, a wadded up package—cigarette package. I opened it. Inside was found 14 gelatin capsules."

After first identifying the cigarette package with the 14 capsules in it as the property taken by him from appellant, Officer Jenks concluded his direct testimony with an account of what he did with the capsules after their seizure. He placed his initials on the package, together with the date and time. The next morning he turned it over to Officer Gorney of the Narcotics Squad, having kept it in his locker in the interim, to which locker he had the only key. Officer Gorney made a field test in his presence, and then placed the cigarette package in a cream-colored envelope which he sealed with scotch tape, placing his initials and the date and time on that envelope, as did also Officer Jenks. Officer Jenks then observed Officer Gorney proceeding with his paper work, which included writing on what is known as a locked sealed envelope.

Officer Jenks was cross-examined briefly on (1) the turning over of the draft card by appellant during the original stop, and (2) Jenks' subsequent examination of the traffic records. Mrs. Ewing, an enforcement clerk in the Department of Motor Vehicles, then testified, without cross-examination, as to what the records of the Department showed. The third witness was Mr. Steele, a Government chemist. He testified that he received a locked sealed envelope from Officer Gorney on April 29, 1968. He put his initials and Gorney's name on the outside, and also a laboratory control number. The envelope was sealed and intact upon its receipt by him, and there was no indication that it had been tampered with. Upon opening in the laboratory, a smaller envelope sealed with scotch tape was found inside; and inside that was a cigarette package containing 14 capsules. Gorney's and Jenks' initials were in the places testified to by them. The capsules, on being chemically analyzed, were found to contain heroin. They remained in the laboratory vault until brought by Steele to the courtroom. Steele's brief cross-examination was largely confined to signs of tampering, but his answers were as on direct.

Appellant took the stand and testified on direct examination only that, during the original stop, Jenks had asked to see his draft card after he had produced his driver's permit and the vehicle registration. He admitted on cross-examination that he had misrepresented his age in seeking the second driver's permit.

With the taking of evidence so completed on the motion to suppress, appellant's trial counsel asserted two reasons why the motion should be granted. One was that the purposes of the routine spot check had been exhausted when appellant exhibited to Officer Jenks his driver's permit and registration, and that Jenks had no right to require appellant to exhibit his draft card. It was urged that, since it was the age discrepancy revealed by the draft card which aroused Jenks' suspicions, everything that followed, including the discovery of the narcotics on the occasion of the later arrest, was the forbidden fruit of this

initial illegal action. The second point advanced in support of the motion was that the evidence revealed no unbroken chain of custody of the seized narcotics reasonably assuring that the capsules introduced into evidence were the same as those which Jenks said he took from the possession of appellant. At the conclusion of arguments by counsel on the merits of these two claims, the court, without elaboration, denied the motion.

At the succeeding trial before the jury, it was stipulated that (1) the capsules in evidence allegedly taken from appellant did in fact contain heroin, and (2) their chain of custody was from Officer Jenks to Officer Gorney to Mr. Steele to the courtroom. Officer Jenks was the only witness for the prosecution and testified on direct essentially as he had on the motion to suppress.[1] He was cross-examined only briefly, and there were no questions relating to the search except one which asked whether appellant had his coat on when he got out of the car, to which the answer was in the affirmative.

The first witness for the defense was one Smallwood, who testified that he was in the car with appellant when the latter was stopped the second time. When appellant got out of the car and walked back to meet Officer Jenks, said Smallwood, appellant did not have his coat on; it was, instead, lying in the back seat of the car. Smallwood had left the immediate vicinity of the car when the narcotics were discovered, although he later observed the police searching the car. The police did not search him or the third occupant of the car when it was stopped.

Appellant testified that, after he got out of the car and was told that he was under arrest for misrepresentation, Officer Jenks went over to the car to get the keys. He picked up appellant's coat in the car and searched it. Finding the narcotics, he announced to appellant that he was under arrest for a narcotics violation. Appellant said that he had allowed his coat to be worn by someone else that day, and that he himself had never placed narcotics in it. On rebuttal, Officer Jenks testified as follows:

"Q. Officer Jenks, where did you get the jacket from or where did you find the narcotics?

"A. In his left breast pocket like my jacket right here—like the jacket I have on.

"Q. Where was the jacket when you recovered the narcotics?

"A. He was wearing it."

In a colloquy with the court pertaining to the instructions to be given, the theory of the defense made before the jury appears clearly in this exchange:

"THE COURT: As I understand, you do not deny the narcotics drug was found by the arresting officer that night or that it was found in a coat, but your position being that the coat was out of the possession of the defendant for a period of hours on the 23 of April, and when it was returned, it was thrown by this friend, Shorty, in the back seat of the car, and not worn by the defendant, and the Officer found the drug in the coat that had been lent to Shorty. Is that your position?

"[DEFENSE COUNSEL] Yes, your Honor."

## II

On appeal to this court, three points were raised by appointed counsel, who had not represented appellant in the District Court. One was a claim that the

[1]. Officer Jenks' description at trial of the finding of the narcotics is contained in the following colloquy:

"Q. What did you do then, officer?
"A. I advised him he was under arrest for operating after revocation and obtaining permit by misrepresentation.

"Q. All right, sir. Now, then what happened?
"A. I searched him in front of me. He had a jacket on. In his left coat pocket—jacket pocket was a wadded up cellophane packet containing 14 gelatin capsules which contained white powder."

District Court erred in denying appellant's pretrial motion, made *pro se*, to dismiss the indictment for want of the speedy trial required by the Sixth Amendment. The other two related to the motion to suppress, and consisted of (1) the chain of custody argument made unsuccessfully in the District Court, and (2) a contention that the narcotics were seized in a search which exceeded the proper scope of one incidental to a traffic arrest.[2] The latter is, of course, in sharp contrast to the argument, pressed upon the District Court but not here, that suppression should flow from the circumstance of the initial examination of the draft card four days before the arrest itself. We do not turn in the first instance to the scope issue, since a ruling for appellant on the merits of either the speedy trial or the chain of custody questions would result in the dismissal of the charges against appellant and render unnecessary our reaching an important constitutional question on a record not compiled by reference to it.

### 1. *Speedy Trial*

Although appellant was continuously represented in the trial court by appointed counsel, he appears to have filed on June 26, 1969, a *pro se* motion to dismiss for lack of a speedy trial. In this motion appellant complained only of the fact that he had been in jail for 13 months unable to make bond. This motion was referred to the judge before whom the

case was set for trial and was denied by him.

■ The period of time from appellant's arrest on April 23, 1968, to his trial on August 21–22, 1969, was just short of 16 months. It appears, however, that the principal reason for the delay was that Officer Gorney, who was an essential witness with respect to the narcotics proposed to be introduced in evidence, suffered a severe heart attack in the winter of 1968–69, and the Government was obliged to seek continuances until he could testify. The record shows one such continuance from March 26, 1969, to April 21. On April 18, the Government reported that it would be at least another month before Officer Gorney's health would permit him to appear, and that, since appellant was unwilling to stipulate as to what Gorney's testimony would be, a further continuance was necessary, to which appellant's counsel did not object. In this connection, it appeared that appellant's counsel was willing to stipulate as requested, but appellant would not consent. In the event, Gorney was never able to testify, and the Government had to go to trial without him. As reported above, however, at trial a stipulation was forthcoming from the defense which could have made trial possible many months earlier.

Although 16 months are certainly more than enough in the way of delay to invite the closest scrutiny, our examination of

2. At the suppression hearing, Officer Jenks testified that, in the course of the investigation made by him after the first stop, he recognized appellant in the picture attached to the driver's permit application in the traffic records. He was then asked on direct examination whether he had found "another picture in any files with respect to Mr. Robinson?" His answer was in the affirmative, and he described that picture as being "in the central records where the criminal files are kept." Although nothing was made of this in the District Court, appellant's brief in this court argued that, because appellant had in fact prior narcotics convictions on his record, Officer Jenks knew of this from his examination of the central records, and that his purpose in arresting appellant on their second encounter was to search for narcotics.

Thus, appellant's presentation of the search issue to the division was largely in terms of an allegedly pretextual arrest, which in law is no arrest at all, at least for purposes of a lawful search incident thereto. Appellant did, in a short footnote to his brief, argue also that, if appellant's coat was in the car when it was searched by Jenks, this would have exceeded the scope of a permissible search incident to a legitimate arrest for a violation of the motor vehicle laws. The division in its opinion assumed the facts underlying these alternative formulations to be against appellant.

the record does not convince us that justice to appellant requires dismissal of his indictment. This is not a case where the Government was either purposefully or inadvertently neglectful. It was prepared to go to trial well within the normal course, but, through no fault of its own, was put under the necessity of seeking delay until Officer Gorney's health improved. Appellant's counsel did not object to this, and appellant himself registered no dissatisfaction until only a few weeks before the trial began.

■ Moreover, there was no allegation before the District Court of reasonable possibility of significant prejudice to appellant in the preparation of his defense. *See, e. g.,* Coleman v. United States, 142 U.S.App.D.C. 402, at 405, 408–410, 442 F.2d 150, at 153, 156–158 (1971); Hedgepeth v. United States, 124 U.S.App.D.C. 291, 294, 364 F.2d 684, 687 (1966). His complaint was that his pretrial detention in jail was so long as to violate his Sixth Amendment right. While length of pretrial incarceration is an important consideration, it is only one of several factors to be taken into account, and may be overridden by a showing, like that before us, of a reason for the delay. *See* United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1965), and Note, The United States Court of Appeals for the District of Columbia Circuit, 1968–1969 Term, 58 Geo.L.J. 80, 140–141 (1969). It differs in kind from an allegation of specific instances of adverse impact upon trial preparation and defense. At the trial, appellant produced one witness who as at the scene of the arrest and who supported the theory presented by the defense to the jury. No other witness was identified who might have done better.

■ We have said that there is "no touchstone of time which sets a fixed maximum period that automatically requires application of the Sixth Amendment." Hedgepeth v. United States, 124 U.S.App.D.C. 291, 294, 364 F.2d 684, 687 (1966). Although the delay in this case is regrettable, neither in its causes nor its consequences does it require the public interest in the prosecution of one charged with serious crime to yield to appellant's interest in an expeditious determination of the merits of the charge against him.

### 2. *Chain of Custody*

Appellant insists that the narcotics should not have been admitted into evidence for the reason that the prosecution failed to establish a chain of continuous custody from the time of their seizure until their appearance in court. The break occurred, so it is said, with the intervention of Officer Gorney. Although Officer Jenks testified that he saw a locked sealed envelope in Gorney's possession, he did not say that he actually saw the cream-colored envelope placed in it nor did he see Gorney actually seal the larger envelope. Since Mr. Steele, the chemist, did not receive the locked sealed envelope until five days later, the continuity of the chain is not, argues appellant, accounted for in such fashion as to guarantee that the capsules offered in evidence were those taken from appellant's coat.

We have in the past, as appellant points out, been alert to the necessity of high standards in maintaining the security of criminal evidence. *See* Novak v. District of Columbia, 82 U.S.App.D.C. 95, 160 F.2d 588 (1947). Our most recent formulation of this principle, however, appears in Gass v. United States, 135 U.S.App.D.C. 11, 14, 416 F.2d 767, 770 (1969), where we said that "the possibilities of misidentification and adulteration [must] be eliminated, not absolutely, but as a matter of reasonable probability."

■ At trial appellant was willing to stipulate that the capsules went from Jenks to Gorney to Steele, before being produced by the last-named in the courtroom. We are not prepared to say on this record that there is such a probability of the capsules having been tampered with while in Gorney's possession as to render them inadmissible in evidence. It is, of course, true that Gorney was, for

reasons beyond his own and the Government's control, unable to testify himself, but we do know from Mr. Steele that he received a locked sealed envelope from Gorney, and that he found inside the cream-colored envelope sealed with scotch tape and bearing Jenks' and Gorney's initials—all as testified to by Jenks.[3]

In the light of this and other corroborative circumstances contained in the record, we are not impressed with the likelihood that chicanery or carelessness characterized the handling of the capsules at some point in their journey from Jenks to the courtroom. If appellant is in fact innocent, it is hardly because the capsules found in the coat are not the capsules offered in evidence. We find no error in the District Court's rejection of this ground of the motion to suppress.

### III

Neither before the division nor *en banc* has the Government relied upon the normal unavailability on appeal of issues not raised in the trial court. Indeed, in its suggestion for rehearing *en banc* it has strongly pressed this court to declare that there is an unqualified right to search the person as an incident of a lawful arrest, irrespective of the nature of the crime for which the arrest is made,

in the interest of the protection of the arresting officers, the arrestee, and those with whom he may come into contact while in custody.[4] To clear away obstacles to this end, it has made representations of fact which go beyond those ascertainable from the record. These are said to be derived from consultations between Government counsel handling the appeal and the prosecutor who tried the case, and consist of reported assertions by the latter that Officer Jenks told him that he [Jenks] "did in fact conduct a search of appellant by examining the left breast pocket of his outer coat and did not limit himself to a mere patdown." In the light of these concessions, the Government asserts that there is no need for a remand because it disclaims any reliance upon the doctrine of plain view.

The Government does argue to us, however, that the overriding justification for a right on the part of the arresting officer to conduct an unlimited search of the person is the protection of the officer's safety and the safety of all persons with whom the arrestee would come into contact while in custody. It asserts that a lawful arrest, unlike an investigatory stop, creates a continuing relationship between the officer and his prisoner which warrants a protective search going beyond the mere frisk—a

---

3. *Novak* involved an asserted gap between the testimony of a police officer who secured a urine sample and placed it in a flask which he initialed, and the testimony of a chemist who, while testifying in court, had in hand the bottle containing the urine he had tested. This court, in opting for inadmissibility, was bothered by the failure to have the police officer testify that the bottle present in court was the same he had used and marked. In the case before us, Jenks testified that the cream-colored envelope, described by Steele and produced by him in court, was the one in which he had enclosed the cigarette package.

4. There appears to be no question on this record regarding the propriety of Officer Jenks' decision to take appellant into custody, in view of the offenses for which he was arrested. Those offenses, *i. e.*, operating a motor vehicle after

revocation of his driver's permit and obtaining a new permit by misrepresentation, are defined, respectively, by statute and ordinance. 40 D.C.Code § 302 (d) ; Section 157(e) of the Traffic Regulations of the District of Columbia. The former is subject to punishment by a fine of $100 to $500, or imprisonment from 30 days to one year, or both. The latter carries a fine of not more than $300 or 10 days in jail. The former is expressly referred to in General Order No. 3 of the Metropolitan Police Department as one of the class of traffic offenses in which the officer is warranted in making a summary arrest; and, at the time of the arrest here involved, the rules of the Court of General Sessions precluded the mere posting of collateral (which is subject to forfeiture without court appearance) but required instead a $300 bond securing the obligation to appear in court.

search indeed that is protective not only of the officer but of the arrestee in the sense that the latter will not be able to use suicidally against himself lethal articles not likely to be disclosed by a mere patdown.

If a purpose of this character is to provide the legal basis for the search of appellant's person in this case, it would presumably be of interest to know such things as whether Officer Jenks' search in this case began and ended with the left breast pocket of appellant's coat, and whether departmental practice or regulations require the arresting officer in every case to search the person of the arrestee thoroughly and completely at the point of arrest in order to assure the safety of both. Such an objective is hardly realized by a search which terminates the moment incriminating evidence is found, even though the search itself is far from finished. The record before us is silent on this score, and remains so even after the Government's volunteered and double hearsay supplementation.

Moreover, there are inevitably difficulties with this kind of supplementation, as compared with testimony under oath on the record elicited by examiner and cross-examiner alike by reference to a precise articulation of what is claimed to be the governing law. A witness with no purpose to evade or distort will not infrequently tell quite a different story when examined under these more rigorous conditions. The rule of law we are urged to declare is too important to admit of confident delineation in the absence of the traditional and tested method of getting at the truth in an adversary context. Our appellate function is best performed when there is before us a record made under circumstances where trial counsel and trial court alike are, in the taking of evidence, fixing their attention upon what is claimed to be the applicable principle of law.

On the record as it came to us, the District Court is surely not to be faulted for ruling as it did. How it may rule after remand is something we leave to the event. We need not decide whether we might have let the conviction stand in light of the record's silence with respect to plain view or other circumstances bringing the search within established doctrines of permissible scope. A new element has been added by the Government's extra-record representations, which we are hardly warranted in ignoring. They leave us little or no room for disposing of this case by affirmance without further inquiry, although, as indicated above, neither do they go so far as to provide a reliable factual base upon which to promulgate the rule of law for which the Government contends.

Since a remand is to be made, we do not pursue at length the legal issue of the permissible scope of the search of the person incident to a lawful arrest. This has been done in the comprehensive opinion issued by a majority of the division,[5] and in the petition for rehearing and suggestion for rehearing *en banc* filed by the Government.[6] They identify and discuss the relevant authorities, and

---

5. The majority asserted that a search incident to arrest can have only two lawful objectives. One is the seizure of evidence of the crime giving rise to the arrest; and the other is to remove any weapons useful in resisting arrest or effecting escape. It held the search invalid in this case because (1) the crime for which appellant was arrested (*i. e.*, driving a car after permit revocation) did not comport with the existence of further evidence, and (2) there being no basis for searching appellant's pockets for evidence, the scope of the weapons search was limited to a patdown.

The dissenting judge, although not accepting this formulation, addressed himself to what he insisted to be the impropriety of reversing the District Court on a point not presented to it and which, if it had been, might have brought out facts clearly validating the seizure.

6. In addition to the arguments, noted above, as to the broad purpose to provide total protection arising out of the custody relationship created by a legal arrest as distinct from an investigatory stop, the Government alleges that there may well have been an evidentiary basis for

they set forth the theoretical foundations variously advanced in support of the conflicting claims as to what the law is or ought to be. Familiarity with them by both court and counsel participating in the remand would illuminate the matters to be explored and decided, and generally contribute to the realization of the purposes for which the remand is being made.

Assuming only for the moment that the Government's disclaimer in this court of plain view is borne out by the testimony on remand, this case may well provide an appropriate vehicle for rational definition of the scope of personal searches incident to lawful arrest—an objective which is urgently important to the administration of justice in this circuit. A central condition of its achievement is an authentic version of what actually happened in this case, including such information as may prove relevant with respect to the operational problems and practices of the police in this field. Only then, and aided by the District Court's application of the law as conceived by it to the facts as found by it, can we meaningfully determine the reach of the Fourth Amendment in the light of existing Supreme Court decisions.

The record in this case is remanded to the District Court for a supplementary evidentiary inquiry on the motion to suppress.

It is so ordered.

J. SKELLY WRIGHT, Circuit Judge (dissenting).

The principal issue in this case concerns the admissibility of narcotics evidence seized during a search incident to an arrest for violation of a District of Columbia motor vehicle regulation. On the basis of this evidence, appellant was convicted by a jury in the District Court of possession of narcotics.

The events leading up to the search were as follows:[1] On April 19, 1968, Officer Richard Jenks of the Metropolitan Police Department stopped a 1965 Cadillac at the intersection of Ninth and U Streets, N. W., for a "routine spot check." At the time of this stop, Officer Jenks examined not only appellant's (temporary) operator's permit and automobile registration card, but also his selective service classification card. Officer Jenks permitted appellant to continue about his business, but only after making notes of the three items. His note-taking alerted him to a discrepancy between the "1938" date of birth listed on the temporary operator's permit and the "1927" date of birth listed on the selective service classification card. Officer Jenks then went to police traffic records and discovered that the operator's permit issued to "Willie Robinson, Jr.," born in 1927, had been revoked, and that a temporary permit had been issued to a "Willie Robinson," born in 1938. The pictures on the revoked permit and on the application for the temporary permit were of the same person; both were likenesses of the man he had stopped for the routine check on April 19.

On April 23, 1968, while on duty, Officer Jenks observed appellant operating the same vehicle. He stopped appellant, asked him for his permit and registration, and, upon being shown the same

the search. This was said to reside in the fact that notices of permit revocation are normally sent offending drivers, and the finding of such a notice in appellant's possession would have been probative of his knowing commission of the crime for which he was arrested. The Government also argues that, in any event, the application of the exclusionary rule in cases like this serves no public purpose.

1. There are two significant discrepancies in the facts as rendered by the opposing parties, which I will point out in subsequent footnotes at the appropriate places in text. If appellant's version of the facts were accepted as true, his case would be far stronger. But where discrepancies have occurred, I have for the purposes of this opinion stated them in the light most favorable to the Government, whose version it must be assumed the jury found more credible at trial. However, as my opinion will show, having resolved all factual disputes in the Government's favor, I still find as a matter of law that the search of appellant in this case was unconstitutional.

permit appellant had exhibited four days earlier, placed appellant under arrest for operating a motor vehicle after revocation of his operator's permit and for obtaining a permit by misrepresentation.[2] According to his testimony, Officer Jenks "advised [appellant] of his rights, and searched him immediately in front of me. I noticed in his left coat pocket—breast pocket of his coat, a wadded up package—cigarette package. I opened it. Inside was [sic] found 14 gelatin capsules."[3] Appellant was then placed under arrest for possession of narcotics.[4]

On October 16, 1968, appellant was indicted by the grand jury for possession of narcotic drugs under 26 U.S.C. § 4704 (a) (1964) and for receipt and concealment of narcotic drugs under 21 U.S.C. § 174 (1964). On August 22, 1969, he was found guilty by a jury on both counts as charged in the indictment, and he subsequently filed the appeal which is now before us.

I would hold the search of Willie Robinson to be unconstitutional on the basis of the fundamental Fourth Amendment principle which has been given renewed emphasis in the housing inspection[5] and stop-and-frisk[6] cases: a search will comply with the Fourth Amendment's protective requirements only if its scope is no broader than necessary to accomplish legitimate governmental objectives. This principle is stated most clearly in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in which the Supreme Court upheld an on-the-street detention and search for weapons of three suspects. The Court found that the police officer in Terry had "adequate constitutional ground," but not probable cause, to believe that the men he detained and searched were going to commit a

---

2. The first of the significant differences in presentation of the facts, or at least in emphasis given the facts by the opposing parties, centers on the further check by Officer Jenks of "criminal records" which occurred after he had checked "traffic records." Counsel for appellant on appeal stressed that appellant did have a record of two prior narcotics convictions, and suggested that Officer Jenks was aware of appellant's prior record, at a minimum through his investigation of "criminal records," and used the subsequent traffic violation arrest as a pretext for a narcotics search which would not have been allowed by a neutral magistrate had Officer Jenks gone for a warrant. Were this claim to be made out, the search would clearly be illegal under the authority of United States v. Lefkowitz, 285 U.S. 452, 467, 52 S.Ct. 420, 76 L.Ed. 877 (1932); Amador-Gonzalez v. United States, 5 Cir., 391 F.2d 308 (1968); Taglavore v. United States, 9 Cir., 291 F.2d 262 (1961). The arresting officer, however, denied that he had any such motive or strategy to evade the normal Fourth Amendment protections and, as stated in Note 1 supra, for the purposes of this opinion I have accepted the Government's version of this factual question.

3. This quote is taken from the hearing on the motion to suppress. Officer Jenks gave substantially the same testimony at trial.

4. The second significant discrepancy in factual accounts has to do with the scope and timing of the search itself. According to Officer Jenks, appellant was wearing the coat at the time of arrest. According to both appellant and a second sympathetic witness, appellant was not wearing his coat at the time of arrest, and Officer Jenks had to go into the car to pick the coat up and search its pockets. Accepting the Government's version of the search—which admits that the heroin capsules were discovered inside a crumpled cigarette package in the breast pocket of the jacket appellant was wearing (clearly not in plain view)—I still find the scope of this search to have been unconstitutionally broad, for the reasons given in text infra.

5. Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 319 (1967). See Note, The Fourth Amendment and Housing Inspections, 77 Yale L.J. 521 (1968).

6. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). See LaFave, "Street Encounters" and the Constitution: Terry, Sibron, Peters, and Beyond, 67 Mich.L.Rev. 39 (1968).

crime. In its opinion the Court stressed that the Fourth Amendment governs *all* intrusions by agents of the public upon personal security, 392 U.S. at 18 n. 15, 88 S.Ct. at 1878, and that the manner in which the search and seizure are conducted is as much the test of their reasonableness as whether they were warranted at all. *Id.* at 28, 88 S.Ct. at 1883. Citing a number of earlier cases, many of which were initiated upon probable cause, the Court in *Terry* stated that "[t]his Court has held in the past that a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope," and that "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Id.* at 17–19, 88 S.Ct. at 1878.

Ordinarily, a warrant must be obtained by a police officer before he may make a search.[7] Searches of both person and place incident to lawful arrest, however, have traditionally been exceptions to this rule and have been held constitutional even though they have been made without prior approval by a neutral magistrate. Because a warrant will not be available to insure that arrest-based searches are reasonable both at their inception and in their execution, courts must review the constitutionality of such searches with special care. *See, e. g.,* United States v. Ventresca, 380 U.S. 102, 106, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Schmerber v. California, 384 U.S. 757, 766–772, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

It was just this kind of extra-careful review which the Supreme Court recently undertook in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). In *Chimel,* the Court used its scope limitation principle to measure the constitutionality of a warrantless, far-ranging search of a house incident to a lawful arrest for larceny. *Terry* was specifically referred to, and the *Chimel* search, in which police discovered coins appellant was accused of stealing, was found to be unconstitutional because it was not " 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." 395

---

7. The Supreme Court has recently held warrants to be such an important element of Fourth Amendment protection that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). (Footnotes omitted.) Twenty years before *Katz,* the Court had written:

   "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. \* \* \* When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent."

   Johnson v. United States, 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). (Footnotes omitted.)

   In a recent law journal article, the importance of the warrant is described as follows:

   " \* \* \* Assessment of the reasonableness of a proposed search by a neutral magistrate is thought by the Court to be a necessary restraint on police. In theory, the magistrate should refuse to approve unreasonable intrusions and should limit by warrant the scope and manner of justifiable searches. In practice, review by a neutral magistrate may become routinized and thus fail to prevent unjustified searches. But at the least, the warrant procedure facilitates later judicial review of the search's constitutionality by requiring a prior sworn statement of police justifications."

   Note, Scope Limitations for Searches Incident to Arrest, 78 Yale L.J. 433, 436–437 (1969). (Footnote omitted.) *See also* Wong Sun v. United States, 371 U.S. 471, 481–482, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962); MacDonald v. United States, 335 U.S. 451, 455–456, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

U.S. at 762, 89 S.Ct. at 2039. *Chimel* holds that incident to a lawful arrest for a crime such as theft, which requires instruments and bears fruits, there is ample justification for a warrantless search of "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763, 89 S.Ct. at 2040.

In *Chimel* the Supreme Court had occasion to analyze and define the proper scope limitations for search of a house incident to a lawful arrest. Here the limits for arrest-based searches of the person are at issue. Although I am reassured to find that my position is consistent with and supported by the rationale and the holding in *Chimel,* I make no claim for its retroactive applicability to this case. A year before *Chimel* the Supreme Court had made it absolutely clear that the underlying rationale of *Terry* was a restatement of, rather than a departure from, existing case law, and

that, although the *Terry* case itself involved a search upon less than probable cause, the scope limitation principle was to apply to all searches no matter what the evidentiary basis for their initiation. 392 U.S. at 17–19, 88 S.Ct. 1868.

What then are the legitimate objectives of an arrest-based search of the person? What is it that renders such searches permissible at their inception, and to which the scope of such searches must be tied, if their reasonableness is to be maintained? Though they receive slightly different formulation in various cases, the legitimate objectives of warrantless searches of the person incident to arrest seem to be (1) seizure of fruits, instrumentalities and other evidence of the crime for which the arrest is made, in order to prevent its destruction or concealment; and (2) removal of any weapons that the arrestee might seek to use to resist arrest or effect his escape.[8] Does either of these legitimate objectives, under the specific circumstances of this case, justify a search such as the

---

8. *See, e. g.,* Chimel v. California, 395 U.S. 752, 762–763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) ; Katz v. United States, *supra* Note 7, 389 U.S. at 357 n. 20, 88 S.Ct. 507. According to Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964), "[t]he *rule allowing contemporaneous searches* is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime—things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control." A recent law journal note comments that "[d]espite the mysterious 'for example,' a thorough search of the case law reveals no other justifications for warrantless searches incident to arrest which do not collapse upon careful inspection into one of the two bases articulated in *Preston.*" Note, *supra* Note 7, 78 Yale L.J. at 434 n. 12. *See also* Note, Search and Seizure— Search Incident to Arrest for Traffic Violation, 1959 Wis.L.Rev. 347, 349 & n. 14.

A recent note in the Columbia Law Review suggests that the only kind of

search justified automatically by a lawful arrest is the evidentiary search :
 " * * * [S]earch incident to arrest is often confused with a search for weapons made in order to protect a police officer. It is not the arrest which gives rise to the need to make a protective search but rather reasonable cause to believe that a suspect is armed. The situations in which a protective search will be permitted are broader than those which will justify a search incident to arrest whereas the scope of a protective search should be more strictly constrained than that of a search incident to arrest. These two standards should operate separately, and indeed the Supreme Court has held that a lawful arrest is not necessary to justify a protective search. What a lawful arrest does justify is the search for fruits, instrumentalities and evidence *of the crime for which the arrest is made,* and this is so only because the existence of probable cause for the arrest of a person normally justifies probable cause to believe that the suspect possesses such items."
Note, Searches of the Person Incident to Lawful Arrest, 69 Colum L.Rev. 867, 870–871 (1969). (Emphasis in original.)

one which was actually made and which is now challenged by appellant as unconstitutionally intrusive?

## II

Since fruits, instruments or other evidence of crime concealed on the person of the arrestee may be easily disposed of or destroyed, the arresting officer will often be justified in searching for such evidence without delay. But the scope limitation principle requires that when police search a person incident to arrest, the search must be directed to finding evidence which the arresting officer has probable cause to believe will be found on the person, and that the search be no more intrusive than necessary to recover such evidence. For some crimes—and more particularly for most traffic crimes [9]—no search of the person for evidence may be allowed at all because no evidence exists to be found. Admittedly, appellant's crime in this case —driving after his operator's permit had been revoked—is a relatively serious one on the continuum of violations set forth in the District of Columbia Motor Vehicles Code. Nonetheless, upon stopping Willie Robinson for the second time and upon receiving for the second time Robinson's fraudulently obtained temporary operator's permit, Officer Jenks had secured the only evidence of the crime for which the arrest was made which he could possibly have had probable cause to believe was in the arrestee's possession. No further arrest-based search for evidence was therefore reasonable or constitutional.

There is, of course, a second, very important justification for searches incident to arrest—the interest of government in the safety of its police officers. But in the case of Willie Robinson, arrested for a traffic code violation, this legitimate goal could have been accomplished by a protective frisk, and no

greater intrusion upon individual privacy is constitutionally permissible. In Terry v. Ohio, *supra*, the Supreme Court approved a pat-down or "frisk" of the appellant's outer clothing for weapons, with a further intrusion only after finding a weapon, precisely because this intrusion was reasonable at its inception and was confined "strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons." 392 U.S. at 30, 88 S.Ct. at 1884. It has been suggested that *Terry* is distinguishable from this case because the search for weapons in *Terry* was based only upon "reasonable suspicion" whereas here appellant was arrested on probable cause. But in focusing on the different quanta of evidence required to justify different degrees of search of the person, one can easily lose sight of the even more telling distinction between the evidentiary purpose and the protective purpose of searches. It is this latter distinction upon which our case hinges.

Because the arrest-based searches reviewed and validated by the courts have usually had *both* evidentiary and protective functions, the casual reader may be given the false impression that these cases stand for the proposition that a lawful arrest will always support a *full* search of the person. Obviously, when the arrest is made for a crime for which evidence exists, a warrantless intrusion into the pockets of the arrestee to discover such evidence is reasonable under the "search incident" exception. The officer may also use this reasonable intrusion to look simultaneously for weapons. But in a fact situation such as ours, where the search can have no evidentiary function, a more careful analysis of proper scope limitations is called for. When the crime is one for which no evidentiary search can be justified, then with regard to the scope of the intrusion

---

9. The main exceptions to this rule are arrests for driving under the influence of alcohol or narcotics. These arrests may—though not necessarily in every case—be predicated on facts which also

constitute probable cause to believe that alcohol or narcotics will be discovered in a search of the person of the arrestee, or of the car in which he is driving. *See* Note 14 *infra*.

on personal privacy which the Constitution will allow for the accomplishment of the single legitimate goal of protecting the arresting officer it is of no moment whether the protective search for weapons is incident to an "arrest" based on probable cause or incident to a "stop" based on reasonable suspicion.

### III

That the scope limitation principle is intended by the Supreme Court to apply to arrest-based searches is expressly established by the last of the cases in the *Terry-Sibron-Peters* trilogy. In Peters v. New York, which is consolidated with Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), Officer Lasky of the New York City Police Department was off duty at his apartment when he heard a noise at the door. Looking through the peephole into the hall, he saw two men he did not believe to be fellow tenants tiptoeing out of the alcove toward the stairway. Officer Lasky called police headquarters, put on civilian clothes, and armed himself with his service revolver. Believing he had happened upon the two men in the course of an attempted burglary, Officer Lasky opened his door, entered the hallway, and slammed the door loudly behind him. When the door slammed, the two men fled down the stairs, and Officer Lasky gave chase. When he caught up with Peters on the stairs and questioned him, Peters explained his presence in the building to Officer Lasky by saying he was visiting a girl friend whose name he chivalrously declined to reveal on the ground that she was a married woman. Officer Lasky then patted Peters down for weapons and discovered a hard object in his pocket. The object did not feel like a gun, but he thought it might be a knife. Officer Lasky removed this object from Peters' pocket and found it was an opaque envelope containing burglar's tools.

Given this fact situation, the Supreme Court held that Officer Lasky legally arrested Peters when he collared him on the stairway and curtailed his freedom of movement. This arrest was found to be valid because made on the basis of probable cause to believe Peters was engaged in criminal activity. At this point, according to the Supreme Court,

> "[Officer Lasky] had the authority to search Peters, and the incident search was obviously justified 'by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime.' * * * *More-over, it was reasonably limited in scope by these purposes. Officer Lasky did not engage in an unrestrained and thorough-going examination of Peters and his personal effects. * * * *"

392 U.S. at 67, 88 S.Ct. at 1905. (Emphasis added.)

In *Peters*, then, the Supreme Court examines very closely a particular arrest-based search having both evidentiary and protective functions and finds that this search—which took the form of a frisk followed by a further intrusion into the arrestee's pockets only after an object possibly a weapon had been felt—was not too "unrestrained and thoroughgoing." Surely when the legitimate goals of the search are more limited, as in this case, to a search with only a protective goal, we should make the same kind of careful inquiry as to the scope of the search as was made by the Supreme Court in *Peters, i. e.,* whether the search was reasonably limited in scope to its legitimate purposes.

A rereading of *Terry* and *Sibron,* in conjunction with *Peters,* makes clear what the proper limits for a protective search should be. In *Sibron,* a direct intrusion into the pockets of a narcotics suspect was held by the Supreme Court to have been unreasonable at its inception because the mere association of the suspect with other known narcotics offenders was held not to have given the investigating officer justification for any search whatever. But the *Sibron* Court went further and held that, assuming *arguendo* the arresting officer had reason to suspect Sibron was armed, the actual search—a direct intrusion into the

suspect's pockets rather than frisk— would still have been constitutionally invalid because not "reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer * * *." 392 U.S. at 65, 88 S. Ct. at 1904.

Terry, Sibron and Peters, when read together, stand for the proposition that, whether the detention is based upon probable cause or not, if the crime is one for which no evidence exists, so that the sole legitimate objective of the search is to protect the arresting officer, then any intrusion greater than a frisk will be unconstitutional. A comparison of factual settings leaves no doubt that the likelihood of harm to the arresting officer was far greater in Terry than in the case which is now before us.[10] A properly conducted frisk here would have provided appropriate protection for the arresting officer.[11] The greater intru-

---

10. In Terry v. Ohio, supra Note 6, the arresting officer was searching men he suspected of attempted robbery, a serious crime for which a weapon is often an instrument. In this case. Officer Jenks had virtually no reason at all to fear he was in danger. First of all, he was arresting Willie Robinson for a crime which does not involve a weapon, and secondly, both his previous encounter with Robinson and Robinson's behavior at the time of the arrest provided no basis for even a reasonable suspicion that Robinson was armed and dangerous. Under these circumstances, it is manifestly clear to me that the same frisk which was found to be proper in Terry—because no broader than necessary to accomplish its legitimate objective—would have provided complete protection for Officer Jenks.

11. A careful reading of Terry and Sibron compels the conclusion that a frisk will be sufficient to protect the arresting officer. In the first place, it must be remembered that a properly conducted frisk is far more than a "petty indignity." In Terry, the Supreme Court takes pains to show that a frisk is a serious intrusion upon the sanctity of the person. Here is a description of a properly conducted frisk:

"[T]he officer must feel with sensitive fingers every portion of the prisoner's body. A thorough search must be made of the prisoner's arms and armpits, waistline and back, the groin and area about the testicles, and the entire surface of the legs down to the feet."

Priar & Martin, Searching and Disarming Criminals, 45 J.Crim.L.C. & P.S. 481 (1954), quoted in Terry, 392 U.S. at 17 n. 13, 88 S.Ct. 1868, 20 L.Ed.2d 889. In the second place, it is clear from Terry that the Court gave full attention to the important value of protecting the police officer. Referring to the interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him, the Court wrote:

"* * * Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

"* * * When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."

392 U.S. at 23–24, 88 S.Ct. at 1881. When the Supreme Court in Terry goes on to allow a frisk of the person of the arrestee to protect the investigating officer, it is clear that the Court believes that the frisk will adequately accomplish this objective.

A protective frisk, of course, does not remove all conceivable dangers to the arresting officer. There will always be the long-shot case in which the arrestee has concealed a novel weapon—perhaps a razor blade shaped like a coin (the very difficulty of conceiving of such a weapon is significant)—which a frisk will fail to reveal. But the kind of thoroughgoing search which would offer total protection to the officer could only be accomplished at a complete sacrifice of the arrestee's right to privacy. And even in a police state, of course, it often proves impossible to guarantee the safety

sion which actually occurred was therefore too "unrestrained and thoroughgoing" to meet the protective requirements of the Fourth Amendment.[12]

My position is completely consistent with the many federal cases—some of them our own—in which search of an automobile subsequent to an arrest for a traffic violation has been validated, not as incident to the traffic arrest, but as reasonably necessary because of the presence of evidence of another crime. Writing for a unanimous panel in Brown v. United States, 125 U.S.App.D.C. 43, 365 F.2d 976 (1966), Judge (now Chief Justice) Burger upheld a warrantless search of an automobile subsequent to an arrest of the driver for driving without a tag light and with an expired inspection sticker. The court, however, was careful not to justify the search as an incident to the traffic arrest. After reviewing the evidence which became available to the officers by radio during the arrest but before the search, the court stated:

"The questions presented on these facts are whether the police had probable cause for arresting Appellant on the robbery charge, whether they did in fact arrest him, and whether the search was therefore permissible as one incident to arrest."

125 U.S.App.D.C. at 45, 365 F.2d at 978. Judge Burger then grounds his opinion on the finding that, while one police officer was questioning the driver as to his traffic violations, a second officer heard over the squad car radio that a robbery had been committed by a person answering the defendant's general description and driving an automobile similar to the one they had just stopped. The court held that these circumstances gave the officers probable cause to arrest the driver for robbery, and it was then, of course, completely reasonable to search the automobile incident to this robbery arrest.

Other federal courts [13] which have considered the "pure" traffic arrest problem specifically hold that, absent "special cir-

of every police officer. Deciding what is a reasonable intrusion, given the legitimate objective of protecting the arresting officer, calls for a careful balancing of competing interests. My position reflects this balancing. Under the circumstances of this case, a frisk offered very substantial protection to the officer and was the greatest intrusion which could be construed as "reasonable" under the Fourth Amendment.

12. Under the circumstances of this case, a frisk was the *most* intrusive search the Constitution will allow. Probable cause to believe that an individual has committed a traffic violation does not in itself provide probable cause or *even* "reasonable suspicion" to believe that he is armed or dangerous in any way. *See, e. g.,* Note, *supra* Note 8, 69 Colum.L.Rev. at 874:

"* * * [T]he distinction between protective and incidental searches does more than to narrow the scope of permissible search. A protective search for weapons should be justified by an arrest alone only to the extent that the arrest creates a reasonable suspicion that the suspect is armed and dangerous. The mere arrest for a traffic violation would not appear to create such a reasonable belief. It follows

that if a protective search is justified at the time of arrest for a traffic violation, it is because of circumstances other than the arrest."

13. While I have made no attempt comprehensively to canvass state law on this subject, I note that there is substantial support for my position among state courts. *See, e. g.,* People v. Anonymous, 56 Misc.2d 1022, 290 N.Y.S.2d 337 (1968); Barnes v. State, 25 Wis.2d 116, 130 N.W.2d 264 (1964); People v. Rodriguez, 47 Misc.2d 551, 262 N.Y.S. 2d 859 (1965); State v. Scanlon, 84 N.J.Super. 427, 202 A.2d 448 (1964); People v. Zeigler, 358 Mich. 355, 100 N.W.2d 456 (1960); Lane v. Commonwealth, Ky., 386 S.W.2d 743, 745 (1965) ("[W]hen a person is arrested for a traffic or other minor violation, the mere fact of the arrest does not give to the officer absolute right to search the vehicle or the premises indiscriminately"); Elliott v. State, 173 Tenn.App. 203, 116 S.W.2d 1009 (1938); People v. Beaman, 44 Misc.2d 336, 253 N.Y.S. 2d 674 (Crim.Ct.1964). According to a recent federal opinion:

"The state court decisions are collected in Annotation, Lawfulness of Search of Motor Vehicles Following Arrest for Traffic Violations, 10 A.

cumstances" not present in this case,[14] a search of the person or automobile not related to the nature of the offense for which the arrest is made is impermissible.[15] *See, e. g.,* United States v. One 1963 Cadillac Hardtop, E.D.Wis., 224 F.

L.R.3d 314. The general rule is that no search may be made as an incident to a traffic arrest. * * * 'The overwhelming weight of the case law holds that there is no right to search either the occupants of the car or the car itself when arrest is made for an ordinary traffic offense'. George, Constitutional Limitations on Evidence in Criminal Cases, Inst. of Continuing Legal Education, 23 (1966). * * *" Amador-Gonzalez v. United States, *supra* Note 2, 391 F.2d at 315–316 n. 8. *See also* Grundstrom v. Beto, N.D.Tex., 273 F.Supp. 912, 921–922 n. 4 (1967), for citation of 22 state cases in which the search of an automobile incidental to an arrest for a traffic violation has been held unreasonable as bearing no relation to the offense.

14. The most common "special circumstance" is new information which becomes readily apparent after the vehicle is stopped, as when the arresting officer sees evidence of another crime in plain view, *e. g.,* Nunez v. United States, 5 Cir., 370 F.2d 538 (1967) ; or when the officer notes a suspicious movement by one of the car's occupants as he makes his approach, *e. g.,* United States v. Thomas, S.D.N.Y., 289 F.Supp. 364 (1968) ; or when the arresting officer has extra knowledge which either connects the driver or passengers with other crimes, *e. g.,* Davidson v. Boles, N.D.W.Va., 266 F.Supp. 645 (1967), or at least increases the likelihood that such a connection exists, *e. g.,* Kershner v. Boles, N.D.W.Va., 212 F.Supp. 9 (1963). The other kind of "special circumstance" upon which courts commonly uphold searches incident to traffic arrests is an indication that the violator is under the influence of either alcohol or narcotics, in which case there is the possibility that evidence will be discovered in a search, *e. g.,* Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) ; Wellman *v.* United States, 5 Cir., 414 F.2d 263 (1969).

15. None of the cases mentioned in text above is precisely in point because they all involve warrantless searches of automobiles. But the rationale of these cases would clearly have been applied to prohibit a search of the person as well, had there actually been such a search. The recent Supreme Court cases upholding searches of automobiles subsequent to arrest involve crimes such as robbery and narcotics violations, for which fruits, instruments and other evidence *do* exist. *E. g.,* Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). In Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 220, 88 S.Ct. 1472, 1475, 20 L.Ed.2d 538 (1961), in which the search of an automobile was held illegal upon other grounds, the Supreme Court carefully left open the question "whether or not a car may constitutionally be searched 'incident' to arrest for a traffic offense."

Within our own jurisdiction, however, the District of Columbia Court of Appeals has recently held invalid a search of an automobile following a traffic arrest on the ground that the search had no relation to the offense for which the arrest was made. While the actual holding of this case is that police had no right to impound appellant's car and to search it during the time appellant was going through the booking process for his traffic arrest and while the car had been parked in the precinct parking lot for less than an hour, the clear implication to be drawn from this case is that the same search made at the time of the arrest would also have been "exploratory and therefore forbidden." United States v. Pannell, D.C.App., 256 A.2d 925, 927 (1969).

Until the panel opinion in this case this court had left open the question whether a person may constitutionally be fully searched incident to an arrest for a traffic offense and absent special circumstances. In Hill v. United States, 135 U.S.App.D.C. 233, 418 F.2d 449 (1968), we remanded on the ground that defense counsel was entitled to inquire whether the procedure by which papers were taken from the defendant at the station house following his arrest for a traffic offense was ordinary. Such an inquiry was held to be necessary and proper to the resolution of the issue whether the traffic arrest was pretextual. Because the case was disposed of in this way, we did not have to consider the "broader" question "whether in any event the search was outside the bounds of reasonableness for this offense in the absence of probable cause as to the robbery." 135 U.S.App.D.C. at 237, 418

Supp. 210, 212 (1963): "[A] minor traffic violation will not generally justify a search of the vehicle and its passengers." *See also* United States v. Tate, D.Del., 209 F.Supp. 762 (1962); United States ex rel. Krogness v. Gladden, D. Or., 242 F.Supp. 499 (1965). Noting that the only legitimate objective of most searches incident to arrests for traffic offenses will be the protection of the arresting officer, one lower federal court recently found that "[t]o permit all searches incidental to an arrest to be justified on the theory that the officer is searching for weapons would be to allow wholesale fishing expeditions whenever a legal arrest is made." Grundstrom v. Beto, N.D.Tex., 273 F.Supp. 912, 916 (1967).[16]

Perhaps the most forceful statement of the principle applicable here comes from a recent decision of the United States Court of Appeals for the Tenth Circuit. In United States v. Humphrey,

409 F.2d 1055, 1057–1058 (1969), then Chief Judge Murrah [17] wrote for a unanimous panel:

"By its own terms the Fourth Amendment protects people 'against unreasonable searches and seizures.' Thus not all searches run afoul of the constitutional sanction but only those unreasonable in origin or scope. While the evolution of this constitutional standard of reasonableness has varied with our sense of justice, it is certain today that warrantless searches on probable cause are reasonable only when it is unfeasible to obtain a search warrant on proper affidavit * * *. Unless, of course, it is reasonably 'incident' to a legal arrest * * *, or can be said to be a mere 'stop and frisk' as in Terry v. Ohio, supra and Sibron v. New York, * * *. Notably, these exceptions are not based on anything inherent in the exception itself but result from the inductive case

---

F.2d at 453. But this opinion did refer to the general doctrine permitting search incident to arrest and stressed that this doctrine is "subject to restriction and, limitation where the arrest is a sham, or *where the search exceeds permissible bounds.*" 135 U.S.App.D.C. at 236, 418 F.2d at 452. (Emphasis added.)

16. *See also* the interesting discussion of this problem in Amador-Gonzalez v. United States, *supra* Note 2. The court in *Amador-Gonzalez* holds that the search of appellant's automobile incident to arrest for a traffic violation was unreasonable because the traffic arrest was merely the pretext for a narcotics search. Judge Wisdom goes on from this point, however, to argue for a test which will switch the emphasis in assessments of the reasonableness of searches from the subjective intent of the arresting officer to a logical and manageable objective rule:

"* * * I would hold that, pretext or no pretext, a lawful arrest of an automobile driver for a traffic offense provides no lawful predicate for the search of the driver or his car—absent special circumstances.

* * * * *

"There is a similarity between the effect of a 'pretextual arrest' and the effect of an unlawful arrest, but the two cannot be equated. Proof that a traffic arrest was only a pretext to

search for evidence of another offense is significant legally only because it bears on the reasonableness of the search. Search incident to arrest is unreasonable, if there is a lack of relation between the search (or scope of the search) and the offense for which the arrest was made. That lack of relationship exists without regard to the motivative cause of the arrest when, as in this case, an automobile driver is arrested for making the wrong turn but is searched for narcotics.

"In this case one of the agents admitted that he arrested Gonzalez in order to search the automobile for narcotics. More often, the determination of the motivation for an arrest requires some judicial divination of the subjective mind. We will have fewer unconstitutional searches, if the emphasis is on the objective relationship between the nature of the offense and the nature (circumstances) of the search, rather than on the motivative cause of the arrest."
391 F.2d at 315. Judge Wisdom wrote the *Amador-Gonzalez* opinion in January 1968. The "stop-and-frisk" cases decided five months later add still further authority to his already convincing position.

17. Now Director of the Federal Judicial Center.

by case application of the constitutional standard of reasonableness. Thus these exceptions are traditionally justified by the need to protect the arresting officers, prevent escape, collect instrumentalities or fruits of the crime (and now evidence, Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)), and prevent delay which might otherwise permit the criminal to escape or commit his crime. * * * From this rationale it is clear that the scope of a search contemporaneous with a legal arrest must have a reasonable relationship to the protection of the officer or the crime for which the accused was arrested. As stated in Terry v. Ohio, supra 392 U.S. at p. 19, 88 S.Ct. at 1878, '[T]he scope of the search must be "strictly tied to and justified by" the circumstances which rendered its initiation permissible', i. e. the detention or arrest. * * * If not, the search is unreasonable and violates Fourth Amendment protected interests. * * * We are in complete agreement with the prevailing federal and state authority which condemns the search of persons and automobiles following routine traffic violations. * * * " [18]

(Citations omitted.)

My conclusion as to the meaning of the constitutional safeguard, and its implementation set forth in case of arrest for violations of the traffic code, is supported, as I have shown, by the analysis of the Supreme Court opinions and the decisions of other federal courts. It is also appropriate to note that similar analyses and conclusions have been reached by scholars who have given careful study to the issues.[19] Wayne LaFave, author of the American Bar Foundation volume Arrest (1965), whose long-term study of arrest problems led to his being selected

---

18. In *Humphrey*, the court found that a warrantless search of the driver of an automobile incident to an arrest for violation of a city traffic ordinance was unreasonable despite testimony that members of the Oklahoma City Police Department routinely search traffic violators because they feel they are in danger whenever they stop an automobile. The court also found, however, that the passenger-defendants in the case had no standing to complain of the search of the driver or of the product of that search —money orders not in the driver's name. These money orders, coupled with the fact that one of the passengers made a suspicious motion with his hands as though putting something under the seat, gave arresting officers probable cause to search the automobile and made the guns discovered during the search admissible as evidence at trial.

United States v. Reid, 415 F.2d 294 (1969), the only more recent Tenth Circuit case dealing with arrest for a traffic violation and subsequent search, cites *Humphrey* with approval. *Reid* is another case which upholds the constitutionality of a search of the automobile under "special circumstances." The Post Office at Fort Towson, Oklahoma, was burglarized and the following morning police officers at Paris, Texas, a distance of about 40 miles from the scene of the burglary, observed an automobile with expired license plates parked in a city recreation area. The officers approached the vehicle and informed Reid and another man, both of whom were asleep therein, that they were under arrest for a traffic code violation. At the direction of the officers, these men got out of the automobile and were "frisked" for weapons. When the front door was opened some heavy tools, including a bar, were observed by the officers on the floor of the automobile. These tools, which were then in "plain view," coupled with the fact of the postal robbery the night before, clearly gave the arresting officers probable cause for the more extensive search which followed and which led to the seizure of weapons and a money box.

19. *See, e. g.*, Note, Search and Seizure— Search Incident to Arrest for Traffic Violation, 1959 Wis.L.Rev. 347; Simeone, Search and Seizure Incident to Traffic Violations, 6 St. Louis U.L.J. 506 (1961); Note, Scope Limitations for Searches Incident to Arrest, 78 Yale L.J. 433 (1969); Note, Searches of the Person Incident to Lawful Arrest, 69 Colum. L.Rev. 867 (1969); Way, Increasing Scope of Search Incidental to Arrest, 1959 Wash.U.L.Q. 261; Note, The Supreme Court 1966 Term, 81 Harv.L.Rev. 69, 117–122 (1967); B. George, Constitutional Limitations on Evidence in Criminal Cases 71 (1969).

by the American Bar Association as reporter to the Committee on the Criminal Trial, noted over 10 years ago that "[a] search of the vehicle and driver incident to an arrest for a traffic violation is a police practice apparently not uncommon throughout the country," and urged that the courts undertake an exacting and detailed consideration of the problem of "defining the proper scope" of such searches. Note, Search and Seizure— Search Incident to Arrest for Traffic Violation, 1959 Wis.L.Rev. 347, 358. Very recently, a writer in the Columbia Law Review found:

"* * * The historical development of incidental personal searches furnishes no support for the validation of searches based solely on the fact of lawful arrest. This point had been overlooked by the early courts, most likely because the fact situations of these early cases were such that under either a categorical or examination-of-the-facts approach, an incidental personal search could be justified. Later courts' failure to analyze the historical underpinnings of the rule led to a hardening of the categorical approach which only recently has begun to be questioned.

"The need for this reexamination is clear. * * * *"

Note, Searches of the Person Incident to Lawful Arrest, 69 Colum.L.Rev. 867, 869 (1969). (Footnotes omitted.) [20]

This Columbia note and a 1969 note in the Yale Law Journal refer to searches incident to traffic arrests as being especially abusive—because the offense is often very trifling, and the search very full-blown—but both also urge that the rule I have outlined should be applied more broadly to searches incident to arrest for all crimes for which no further evidence can exist.[21]

Not only was the search of Willie Robinson bad in theory; the practical effect of a rule permitting warrantless "full" searches incident to most traffic arrests (or for that matter, incident to arrests for status crimes) is fearsome to imagine. As Judge Wisdom has written, the danger is "that the lowly offense of a traffic violation—of which all of us have been guilty at one time or another—may be established as the basis for searches circumventing the rights guaranteed by the Fourth Amendment." Amador-Gonzalez v. United States, 5 Cir., 391 F.2d 308, 318 (1968). The rule that a *full* search without a warrant will be supported by *any* lawful arrest gives dangerously broad discretion to the police officers who must apply it. Logically and consistently applied, such a rule endangers the rights of the physician hurrying

20. Judge Nathan R. Sobel of the New York Supreme Court reviewed the problem as follows:
    "The question arises—
    "'Do the police have the right to search the person or automobile following a lawful arrest for a traffic violation?' The answer is an unequivocal 'NO!' despite many cases to the contrary. The reason is simple.
    * * * * *
    "For whenever a search is made following an arrest for a traffic violation the primary purpose is no longer to arrest but rather to search for 'evidence' of entirely unrelated crimes. Such a search is ipso facto general and unreasonable. There are *no* exceptions to this rule."
    N. Sobel, Search and Seizure 119 (1964). (Emphasis in original.)

21. The court is not called upon to decide today the proper limits for searches incident to arrest for "status" offenses, or to reexamine the decision in Worthy v. United States, 133 U.S.App.D.C. 188, 409 F.2d 1105 (1968). I do, however, agree with the Columbia Law Review and Yale Law Journal notes cited above that the wiser approach would be to have the rule I articulate in this opinion apply broadly to all arrests for crimes for which no further evidence can exist. Although our own circuit allowed a full search of the person incident to an arrest for vagrancy when it last considered the question in *Worthy*, the recent Supreme Court case of Chimel v. California, *supra* Note 8, applying the scope limitation principle of *Terry*, *Sibron* and *Peters* to a search incident to arrest, casts grave doubt on the continuing validity of that holding.

to a night call who runs a stop sign, or of the young woman with her bags packed and on her way back to college, or of the corporate executive arrested for criminal conspiracy under the antitrust laws, or of the civil servant accused of tax fraud, or of any one of us a police officer—for whatever secret motive or for no reason at all—wishes to search without the hindrance of normal Fourth Amendment protections.

### IV

Neither the dissenting opinion at the division level nor the majority of the court *en banc* challenges the principles of law recognized in this opinion. Instead they argue that the facts surrounding the search of Willie Robinson were insufficiently developed in the District Court to permit a reliable judgment on the legality of the seizure of the narcotics. Judge Wilkey's dissent to the panel opinion suggested that the narcotics may have been in plain view and, consequently, were legally seized without a search. Thus the crucial factual issue in this case in its present posture is whether the narcotics taken from appellant by the police were in plain view or were discovered in a search incident to his arrest. Noting Judge Wilkey's plain view suggestion, the Government, in its petition for rehearing *en banc,* commendably and candidly foreclosed further speculation on this score. Its petition, at page 4 n. 2, states:

" * * * Our consultation disclosed that Officer Jenks did in fact conduct a search of appellant by examining the left breast pocket of his outer coat and did not limit himself to a mere pat-down. Since any hearing on remand would of course have disclosed this fact, appellee felt it to be in furtherance of the expeditious and efficient disposition of the case to concede the point for the purpose of arguing this appeal. Specifically, we concluded that it would not be appropriate even to suggest that the package containing the narcotics might have come within the officer's plain view when we knew the facts to be otherwise."

If the Government has plain view evidence, I doubt seriously it would concede that Officer Jenks did in fact conduct a search of appellant. In the interest of efficient and effective administration of justice, I submit, we should accept the Government's concession and hold, for the reasons stated in this opinion, that the seizure of the narcotics from appellant resulted from an illegal search requiring reversal of his conviction.

I respectfully dissent.

MacKINNON, Circuit Judge (dissenting):

I see no necessity for a remand and would affirm on the basis of the record below which supports a finding that the narcotics turned up in the process of a lawful search of the person pursuant to a lawful arrest on the highway of Robinson for operating a motor vehicle during the period his operator's permit was revoked, D.C.Code § 40–302.[1] It is also obvious from the record that the arresting officer had probable cause to believe that the Robinson operating the automobile was not the Robinson described in the motor vehicle operator's permit which he tendered to the officer and he was therefore authorized to search him for identification evidence such as I.D. cards, credit cards, draft card, handwriting, etc., that might tend to prove his proper identity and that he was the same Robinson whose permit had been revoked. Such evidence is probative on such issues. Vauss v. United States, 125 U.S.App.D.C. 228, 370 F.2d 250 (1966). Such evidence might also be probative as to possible forgery of his operator's permit under D.C.Code § 22–1401. *Cf.* Morgan v. United States, 114 U.S.App.D.C. 13, 309 F.2d 234, 236 (1962). Thus I have no difficulty in finding that it was reasonable to make a full search of Robinson for such evidence of identification. Warden Md. Penitentiary v. Hayden, 387 U.S.

---

1. This is a serious offense punishable by a maximum fine of $500 or imprisonment for one year, or both. D.C.Code § 40–302 (1967).

1236

294, 301–310, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

It is also a violation of the motor vehicle statutes of the District of Columbia for any person, while under the influence of a narcotic drug, to operate any motor vehicle in the District of Columbia, D.C. Code § 40–609. Likewise, it is "unlawful * * * to transport * * * any contraband article [narcotic drug possessed with intent, etc.], in, upon, or by means of any * * * vehicle" for which act the motor vehicle may be "seized and forfeited." 49 U.S.C. §§ 781, 782; One 1960 Oldsmobile Convertible Coupe v. United States, 125 U.S.App.D.C. 305, 371 F.2d 958 (1966); *see also,* Cooper v. California, 386 U.S. 58, 60, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). An arrest for operating a motor vehicle under a revoked permit does not require the officer to close his eyes to these other offenses which involve motor vehicles and it would be hard to imagine how any thorough search of Robinson for identification evidence, which was plainly authorized, could have failed to turn up the narcotics which were discovered. I respectfully dissent.