## UNITED STATES of America

v.

**Henry T. LANE, a/k/a Dutch, a/k/a Henry T, Appellant (two cases).**

**Nos. 77–1393, 77–1394.**

United States Court of Appeals, District of Columbia Circuit.

Submitted without Oral Argument Dec. 29, 1977.

Decided Jan. 12, 1979.

---

David Carey Woll, Rockville, Md. (appointed by this Court), was on brief, for appellant.

Earl J. Silbert, U. S. Atty., John A. Terry, James F. Rutherford and Richard C. Otto, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before ROBINSON, ROBB and WIL-KEY, Circuit Judges.

Opinion for the Court filed by SPOTTS-WOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

On evidence tending to prove eight sales of heroin to an undercover police officer, appellant has been convicted of distributing that drug.[1] At trial, he objected to introduction of the allegedly-sold packets of her-oin into evidence on the ground that the Government had failed to establish a sufficiently-protective chain of custody extending from the charged incidents to the points at which the contents of the packets were subjected to chemical analysis. The District Court let the contested items in, and the sole question on appeal is whether it erred in doing so. We conclude that the Government demonstrated sufficient compliance with its obligation to take prudent steps to safeguard the substances sold against misidentification and alteration, and that accordingly the evidence was properly received.

## I. THE GOVERNING PRINCIPLES

Tangible evidence of crime is admissible when shown to be "in substantially the same condition as when the crime was committed."[2] And it is to be presumed that the integrity of evidence routinely handled by governmental officials was suitably preserved "[unless the accused makes] a minimal showing of ill will, bad faith, other evil motivation, or some evidence of tampering."[3] If, however, that condition is met, the Government must establish that acceptable precautions were taken to maintain the evidence in its original state.[4]

The undertaking on that score need not rule out every conceivable chance that somehow the identity or character of the evidence underwent change.[5] "[T]he possi-

1. Pursuant to 21 U.S.C. § 841(a) (1976).

2. *United States v. S. B. Penick & Co.*, 136 F.2d 413, 415 (2d Cir. 1943). Accord, *United States v. Santiago*, 534 F.2d 768, 769 (7th Cir. 1976); *United States v. Brown*, 482 F.2d 1226, 1228 (8th Cir. 1973); *Brewer v. United States*, 353 F.2d 260, 262 (8th Cir. 1965); *United States v. Godoy*, 528 F.2d 281, 283 (9th Cir. 1975); *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960).

3. *United States v. Daughtry*, 502 F.2d 1019, 1021 (5th Cir. 1974). Accord, *United States v. Santiago, supra* note 2, 534 F.2d at 770 ("[b]ecause the defendant could elicit no testimony that any of the seals was disturbed apart from the ordinary course of examining the evidence or that the . . . labels had been altered, his claim is insufficient to rebut the Government's showing"); *United States v. Brown, supra* note 2, 482 F.2d at 1228; *West v.*

*United States*, 359 F.2d 50, 55 (8th Cir.), *cert. denied*, 385 U.S. 867, 87 S.Ct. 131, 17 L.Ed.2d 94 (1966); *Brewer v. United States, supra* note 2, 353 F.2d at 263; *United States v. Godoy, supra* note 2, 528 F.2d at 283–284; *Gallego v. United States, supra* note 2, 276 F.2d at 917 ("[w]here no evidence indicating otherwise is produced, the presumption of regularity supports the official acts of public officers and courts presume that they have properly discharged their official duties"). See also *Gass v. United states*, 135 U.S.App.D.C. 11, 14, 416 F.2d 767, 770 (1969).

4. *United States v. Santiago, supra* note 2, 534 F.2d at 769; *United States v. Jackson*, 482 F.2d 1264, 1266 (8th Cir. 1973).

5. *Gass v. United States, supra* note 3, 135 U.S. App.D.C. at 14, 416 F.2d at 770; *United States v. S. B. Penick & Co., supra* note 2, 136 F.2d at

bilities of misidentification and adulteration [must] be eliminated," we have said, "not absolutely, but as a matter of reasonable probability."[6] So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in light of the surrounding circumstances.[7]

## II. THE CUSTODIAL PROCEDURES

In the cases at bar, the custodial procedures utilized can readily be traced. Velma N. Holmes, an undercover officer attached to the Narcotics Branch of the Metropolitan Police Department, bought a packet of heroin from appellant on each of eight occasions over a three-month period. After each purchase, she placed the packet in a small manila envelope, which was immediately sealed[8] and labeled with appellant's name, the date and the place of the transaction. Officer Holmes then handed the sealed envelope over to one of her supervising control officers[9] who field-tested its contents, replaced them in the manila envelope,[10] labeled and secured that envelope in a larger lock-seal envelope,[11] and deposited the lock-seal envelope in the Department's narcotics mailbox.

Later, each lock-seal envelope was taken from the mailbox and transported to the regional laboratory of the Drug Enforcement Administration (DEA) where it was labeled and placed in a central vault. Only while undergoing analysis by a DEA chemist were the envelopes outside the central vault. When removed for that purpose, the chemist initialed and dated the envelopes, and during the period of analysis he stored them in his personal vault. When testing was completed, the chemist secured the packet, the small manila envelope and the lock-seal envelope in a still larger DEA lock-seal envelope, which was then labeled and returned to the central vault. The DEA envelopes were delivered to the courtroom by the chemist, who opened them at trial; and there the contents of each envelope were identified by Officer Holmes, the supervising control officer and the chemist.

## III. THE CONTENTIONS

Appellant insists the custodial procedures thus utilized did not ensure that the DEA chemist analyzed the same substance sold to Officer Holmes. This claim is based upon several circumstances. Officer Holmes testified that she initialed the packets of her-

415; *United States v. Stevenson*, 445 F.2d 25, 27 (7th Cir.), *cert. denied*, 404 U.S. 857, 92 S.Ct. 108, 30 L.Ed.2d 99 (1971); *United States v. Santiago, supra* note 2, 534 F.2d at 769; *United States v. Bridges*, 499 F.2d 179, 185 (7th Cir.), *cert. denied*, 419 U.S. 1010, 95 S.Ct. 330, 42 L.Ed.2d 284 (1974); *West v. United States, supra* note 3, 359 F.2d at 55.

6. *Gass v. United States, supra* note 3, 135 U.S. App.D.C. at 14, 416 F.2d at 770.

7. *United States v. Haldeman*, 181 U.S.App.D.C. 254, 330–332, 559 F.2d 31, 107–109 (en banc 1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Robinson*, 145 U.S.App.D.C. 46, 51, 447 F.2d 1215, 1220 (en banc 1971), *on rehearing*, 153 U.S. App.D.C. 114, 471 F.2d 1082 (en banc 1972), *rev'd on other grounds*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *United States v. S. B. Penick & Co., supra* note 2, 136 F.2d at 415. And on appeal the trial court's ruling will not be reversed absent a clear abuse of discretion. *United States v. Daughtry, supra* note 3, 502 F.2d at 1021; *United States v. Stevenson, supra* note 5, 445 F.2d at 27; *United States v.*

*Bridges, supra* note 5, 499 F.2d at 185; *United States v. Brown, supra* note 2, 482 F.2d at 1229; *Brewer v. United States, supra* note 2, 353 F.2d at 262; *United States v. Godoy, supra* note 2, 528 F.2d at 283; *Gallego v. United States, supra* note 2, 267 F.2d at 917.

8. After each of the first three purchases, Officer Holmes sealed the manila envelope only well enough to keep it closed. Thereafter, compliably with then newly-promulgated procedures, she completely sealed the last five.

9. Control officers supervised undercover officers in the field for purposes of tracking down dealers in narcotics.

10. After the first three purchases, the packets were replaced in the original envelopes. Under the new procedures, see note 8 *supra*, the packets were transferred to new envelopes, which then were sealed and labeled.

11. A lock-seal envelope can be opened only by breaking the lock or destroying the seal.

oin as she purchased them, yet on one of the eight she could not find her initials. Officer Holmes also testified that she sealed the manila envelopes containing the packets, yet a control officer testified that he could not recall whether one of the envelopes was sealed when he received it from her. Moreover, prior to meetings with her control officers, Officer Holmes kept the envelopes enclosing purchases from appellant together with envelopes of purchases from others. Transfers of the envelopes to control officers did not always occur on the dates of sale; on these occasions, she took the envelopes home for the night. One of the control officers testified also that he, too, might have kept transferred envelopes at home overnight when unable to deposit them in the Department's narcotics mailbox on days they were received from field officers. Appellant further notes that before being secured in lock-seal envelopes the drugs were handled in unlockable envelopes.

We find these events insufficient to outlaw admissibility of the challenged evidence. Officer Holmes undertook to account for the discrepancy between her statement that upon receipt she initialed all the packets of heroin and her inability to find any markings on one—a tinfoil packet—at trial. When confronted with the variance, she responded, "I guess I should have [pressed] down more on the tinfoil here than I did." [12] Furthermore, her notations on the sealed manila envelope containing this packet, as well as on the outer lock-seal envelope, earmarked the packet as one purchased from appellant. The remain-

ing circumstances he refers to do indicate some chance for inadvertent misidentification and some opportunity for tampering, but they were no more than conditions affecting the weight that might be accorded the evidence by the jury.[13] They did not amount to justification for excluding the packets,[14] as our past decisions—even those relied on by appellant—make apparent.

## IV. THE PRECEDENTS

In *Novak v. District of Columbia*,[15] a prosecution for driving an automobile under the influence of liquor, we reversed a conviction based primarily on a laboratory report which indicated a high alcoholic content in the accused's urine. At trial, the arresting police officer testified that he obtained a urine sample, placed his initials and the accused's name on the bottle containing the specimen, and delivered the bottle for chemical analysis. The chemist testified to the alcohol content of urine in a bottle labeled with the accused's name, and the report of the analysis was then admitted into evidence. The difficulty was that the bottle to which the chemist referred was never identified as the one in which the arresting officer had procured the accused's sample. Because the Government had thus failed to establish that the specimen analyzed was the one supplied by the accused, we held that the proof of the chain of custody was inadequate.[16]

Similarly, in *Smith v. United States*,[17] we reversed a robbery conviction because the Government's evidence did not show that the articles allegedly stolen had been

12. Trial Transcript 124.

13. *United States v. S. B. Penick & Co., supra* note 2, 136 F.2d at 415; *Brewer v. United States, supra* note 2, 353 F.2d at 262; *United States v. Vansant,* 423 F.2d 620, 621 (9th Cir.), *cert. denied,* 400 U.S. 835, 91 S.Ct. 72, 27 L.Ed.2d 68 (1970). And see *Gass v. United States, supra* note 3, 135 U.S.App.D.C. at 15, 416 F.2d at 771.

14. See, *e. g., United States v. Rowlette,* 397 F.2d 475, 477 (7th Cir. 1968) (government agent's overnight retention of purchased narcotics does not render them inadmissible in evidence); *United States v. Godoy, supra* note

2, 528 F.2d at 283–284 (purchased narcotics admitted into evidence where the outer package was unsealed when received at the laboratory and the field weight varied slightly from the laboratory weight, but the inner package remained intact and the discrepancy in weight could be attributed to the use of different scales).

15. 82 U.S.App.D.C. 95, 160 F.2d 588 (1947).

16. *Id.* at 96, 160 F.2d at 589.

17. 81 U.S.App.D.C. 296, 157 F.2d 705 (1946).

obtained from the accused. Neither the victim nor the police officer who supposedly had taken the articles from the accused was a witness at trial, and the testimony proffered to connect the accused with the articles was at best conjectural.[18] As in *Novak,* an evidentiary link essential to the Government's case was missing.

Here, in contrast to *Novak* and *Smith,* the evidence portrayed a continuous chain of custody affording what we can only deem substantial protection against misidentification or adulteration of the substances procured from appellant. Upon acquisition by the undercover officer, the drug-packets were sealed in manila envelopes, which were labeled to preserve identifying data. These envelopes were then delivered to a control officer who, after field-testing, secured them and their contents in further-labeled lock-seal envelopes and deposited them in the Police Department's narcotics mailbox. From the mailbox, the lock-seal envelopes were transported to the DEA laboratory where they were relabeled and placed in a central vault, and they remained therein save when undergoing analysis. When withdrawn for that purpose, they were initialed and dated; while under analysis they were kept in the examining chemist's personal vault; and when the process was completed they were placed in even larger DEA lock-seal envelopes, labeled and returned to the central vault. The chemist himself brought the DEA envelopes to trial; and there the packets purchased from appellant and the envelopes in which they were preserved were separately and uniformly identified by the undercover agent who made the purchases, the supervising control officers who received the purchased products from the undercover agent, and the DEA chemist who analyzed them.

The situation here, then, is akin to that which we addressed in *Gass v. United States,*[19] where the issue was the caliber of the custody of slides containing smears taken during a gynecological examination in a hospital. The examining physician marked the slides with the patient's name and her own, and turned them over to a nurse who took them to the hospital's laboratory where, on the following morning, they were subjected to pathological analysis. At trial, both the physician and the pathologist identified the slides by the physician's markings. We held that this evidence established the chain of custody adequately enough to authorize admission of the slides into evidence,[20] with the weight to be attributed to them a matter for the jury.[21] Similarly, in *United States v. Alston,*[22] a narcotics agent testified that upon obtaining tape recordings he replayed them, initialed them and turned them over to his supervisor. The supervisor testified that he likewise initialed the tapes and then placed them in a sealed envelope, which was stored in a vault until the time of trial. The Fifth Circuit deemed these steps sufficient to establish the requisite chain of custody.[23]

## V. CONCLUSION

Clearly, the custodial procedures employed in the cases at bar were at least as exacting as those approved in *Gass* and *Alston.* By the same token, the Government sustained its burden of demonstrating satisfactory precautions to preserve the

---

18. *Id.* at 296–297, 157 F.2d at 705–706.

19. *Supra* note 3.

20. We recognized that "unaccounted for was the period when the nurse had [the slides] in transit from [the physician] to the laboratory," but we concluded that the nurse's testimony was not essential to the demonstration the Government was required to make. 135 U.S. App.D.C. at 14, 416 F.2d at 770. Rather, we relied upon "[t]he normal presumption that individuals entrusted with grave responsibilities discharge them with care," particularly since

"[t]he record [was] bare of any indication that the nurse mishandled or tampered with the slide." *Id.* Compare text *supra* at note 3.

21. *Id.* at 13–16, 416 F.2d at 769–772. See also *Wheeler v. United States,* 93 U.S.App.D.C. 159, 164, 211 F.2d 19, 23 (1953), *cert. denied,* 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140 (1954).

22. 460 F.2d 48 (5th Cir.), *cert. denied,* 409 U.S. 871, 93 S.Ct. 200, 34 L.Ed.2d 122 (1972).

23. *Id.* at 56.

identity and character of the drugs purchased from appellant. To be sure, the safeguards erected were not foolproof but, as a matter of reasonable probability, the substances purchased from appellant were protected against the risk of misidentification or adulteration, and no more was required.[24] The District Court thus properly admitted the eight packets of drugs into evidence, and the judgment appealed from is

*Affirmed.*

**24.** See text *supra* at note 6.